**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ANITA MARIE B.,[1] <br>                   **Plaintiff,** <br><br> vs. <br><br> MARTIN O'MALLEY, Commissioner of <br> Social Security, <br>                   **Defendant.** | ) <br> ) <br> ) <br> ) <br> )   **Case No. 23-CV-2768-SMY** <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM AND ORDER**

**YANDLE, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Anita Marie B. seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423 (Doc. 1).

**Procedural History**

Plaintiff applied for DIB on February 11, 2020 (Tr. 182).  Plaintiff's initial alleged disability onset date was August 5, 2019.  *Id.*  Plaintiff's claims were denied on November 9, 2020 (Tr. 104-106).  Her request for reconsideration was also denied on February 1, 2021 (Tr. 109-111).  Plaintiff then requested a hearing with an ALJ (Tr. 112-113).

After conducting an evidentiary hearing, the ALJ denied the application on October 26, 2021 (Tr. 35-60).  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review.  (Tr. 26-31).

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.  *See,* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

**Issues Raised by Plaintiff**

Plaintiff raises the following issues:

1.    The ALJ failed to comply with applicable regulations in evaluating Plaintiff's subjective complaints.

2.    The ALJ failed to seek development of the record despite the RFC's significant departure from the available opinion evidence.

**Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

In determining whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. § 404.1520.   An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled.   A negative answer at any step, other than at step 3, precludes a finding of disability.   The claimant bears the burden of proof at steps 1–4.   Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy.   *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."   42 U.S.C. § 405(g).   Thus, the Court is not tasked with determining whether Plaintiff was disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for substantial evidence, the Court considers the entire administrative record, but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).   At the same time, judicial review is not abject; the Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## Decision of the ALJ

The ALJ followed the five-step analytical framework described above (Tr. 35-55).   She found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of August 5, 2019 through her date last insured of June 30, 2020 (Tr. 37).   She found that Plaintiff had the following severe impairments:   Raynaud's phenomenon, degenerative disc disease of the lumbar spine, mixed connective tissue disease, chronic headache and/or migraine headaches, irritable bowel syndrome, mild left axonal peroneal mononeuropathy, mild bilateral carpal tunnel syndrome (CTS), early osteoarthritis of the bilateral knees and left hand, peripheral neuropathy, anxiety, and angina and left anterior descending coronary artery stenosis with stent placement (Tr. 37-38)   The ALJ found that these severe impairments significantly limit

3

the ability to perform basic work activities (Tr. 38).   The ALJ also found that Plaintiff had other

impairments including hypothyroidism, insomnia, and hypertension.   *Id.*   Based on these

impairments, the ALJ concluded that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments listed in

the Commissioner's list of presumptively disabling impairments, 20 CFR Part 404, Subpart P,

Appendix 1 (Tr. 38-44).

> The ALJ determined that Plaintiff had the RFC to do the following:

> Sedentary work as defined in 20 CFR 404.1567(a) except she can never climb ladders,
> ropes, or scaffolds but can occasionally climb ramps and stairs.   She can engage in
> occasional stooping, kneeling, crouching, and crawling and can perform frequent fine
> and gross manipulation.   She cannot work at unprotected heights or around moving
> mechanical parts or other such hazards.   She can have no concentrated exposure to
> extreme heat, cold, humidity, wetness, dust, fumes or other pulmonary irritants such as
> toxic or caustic chemicals.   She can maintain the concentration required to perform
> simple routine tasks, remember work procedures, and make simple work-related
> decisions.   She cannot work at a fast pace such as an assembly line but can stay on task
> and meet reasonable production requirements in an environment that allows her to
> maintain a flexible and goal-oriented pace.   She is further limited to work that requires
> only occasional changes in the work setting which are introduced gradually (Tr. 44-45).

The ALJ concluded that Plaintiff was not able to perform her past relevant work, but there were

other jobs in significant numbers in the national and local economy that Plaintiff could perform,

such as order clerk, circuit board screener, and optical goods assembler (Tr. 54-55).   As such, the

ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. 55).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this

Memorandum and Order.   The following summary of the record is directed to the points raised

by Plaintiff.

**Agency Forms**

Plaintiff was 45 years old at the time of the ALJ's decision. (Tr. 54).   She claimed she was

disabled due to mixed connective tissue disease, borderling lupus, Hashimoto's disease, Raynaud's

phenomena, carpal tunnel, neuropathy, arthritis, irritable bowel syndrome, memory loss, and

migraines (Tr. 201).   Plaintiff took numerous medications for her conditions (Tr. 204).   Plaintiff

had worked in the past as a general manager of a pizza place (Tr. 733-734), photography assistant

manager, a front desk clerk/laundry in hospitality, a receptionist at a community college, a school

bus driver, and as a trustee in local government (Tr. 203).   She indicated she stopped working on

November 20, 2018, because of her conditions (Tr. 202).

Plaintiff completed a function report on May 12, 2020 (Tr. 217-225).   She stated that she

has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair

climbing, with memory, with completing tasks, with concentration, with understanding, with

following instructions, and with using her hands (Tr. 222).   She has trouble doing both physical

and mental tasks on her bad days (Tr. 217, 222).   A second function report dated December 18,

2020 was submitted as well(Tr. 244-251).   Plaintiff's complaints remained unchanged, and she

stated that she has bad days 2 times a week where she cannot do anything other than dress herself,

use the bathroom, and eat (Tr. 244).

**Evidentiary Hearing**

Plaintiff was represented by Attorney Brent Matthew Gaines at the September 14, 2021

hearing (Tr. 49-81).   She testified that she has been diagnosed with back pain, lupus, migraines

with visual aura, peripheral neuropathy, a B12 deficiency, thyroid problems, and cardiac issues

(Tr. 737, 742, 743).   Her husband has to do the chores in the household because if she is on her

5

feet doing chores then her legs will swell (Tr. 736-737).   She spends the majority of her days

sleeping (Tr. 744).   She cannot handle cold temperatures (Tr. 739) and has migraines at least once

or twice a week that leave her debilitated (Tr. 740).   She also struggles with memory issues from

her thyroid condition (Tr. 742).

Plaintiff testified that the conditions that preclude her from working are the swelling in her

feet and her inability to use her hands because of the Raynaud's, the lupus swelling, and the carpal

tunnel (Tr. 743).   Her hands cramp and she will sometimes have difficulty buttoning, zipping,

grabbing and holding items (Tr. 744).   She could not do a job where she sat most of the day

because sitting would cause her legs to swell, the arthritis in her back keeps her from being able to

sit too long, and she would have to constantly be moving to deal with her irritable bowel syndrome

or trying to alleviate the pressure in her back, knees or feet (Tr. 745).

A vocational expert (VE) testified that Plaintiff's past work as a fast-food manager was

classified as light with an SVP of 5 and performed at the medium work demand (Tr. 748).   The

ALJ posed a hypothetical to the VE that comported with the ultimate RFC assessment – a person

of Plaintiff's age and education (four years of college) and past work as described – that cannot

climb ladders, ropes or scaffolds – can only occasionally use ramps and stairs – can occasionally

stoop, kneel, crouch and crawl – with frequent fine and gross manipulation – with no work at

unprotected heights around moving mechanical parts or other such hazards – and with no

concentrated exposure to extreme heat, cold, humidity, wetness, dust, fumes or other pulmonary

irritants like toxic or caustic chemicals (based upon Plaintiff' testimony regarding hot and cold

and her cardiac condition) (Tr. 748-749).   The VE testified that this person could not perform

Plaintiff's past work (Tr. 749).   However, there are other light and unskilled work in the national

economy that the hypothetical could perform: dining attendant, retail clerk, or housekeeper. *Id.*

The ALJ added to the hypothetical person one that can maintain the concentration required to perform simple, routine tasks, remember work procedures and make simple work-related decisions – cannot work at a fast pace, such as an assembly line, but can stay on-task and meet reasonable production requirements in an environment that allows the individual to maintain a flexible and goal-oriented pace – but limited to work that requires only occasional changes in the work setting, which are introduced gradually (Tr. 749-750). The VE testified that this person could not perform Plaintiff's past work (Tr. 750). However, the same light and unskilled jobs previously referenced could still be available. *Id.*

The ALJ changed the hypothetical to a sedentary hypothetical – without mental limitations but at the sedentary work demand (Tr. 750). The VE testified that this person could not perform Plaintiff's past work. *Id.* However, such a person would have available work classified as sedentary and unskilled like an order clerk, a circuit board screener, or an optical goods assembler (Tr. 750-751). The ALJ changed the hypothetical to sedentary with mental limitations as previously indicated (Tr. 751). The VE testified again that while this person could not perform Plaintiff's past work, the same sedentary and unskilled jobs previously referenced could still be available. Id.

The ALJ questioned the VE regarding additional limitations. (Tr. 752). The VE testified that no jobs would be available at the sedentary work demand level if the work demanded occasional handling and fingering; if the individual had to elevate their legs at waist level for about 15 minutes every hour; if the individual could not, even occasionally, lift ten pounds; if the individual had to alternate sitting and standing and walking every 15 minutes; and, if the individual

7

was off-task 20 percent of the workday or absent two or more days per month (Tr. 751-752). The VE further testified that at either light or sedentary unskilled work, if the hypothetical individual needed additional breaks throughout the day, employment would require an accommodation for any extra breaks (Tr. 753).

### Relevant Medical Records

Plaintiff began treating with Dr. Allan Morton, a rheumatologist, in 2014 when she resided in Michigan (Tr. 276-281). His notes and letter indicate that Plaintiff suffered from primary connective tissue disease with significant joint pain, fatigue, and other symptoms; significant degenerative arthritis of the lumbar spine with significant pain and fatigue; and, an abnormal MRI of her brain identifying decreased mental acuity (Tr. 276). Dr. Morton was also the first in the records to indicate that some of Plaintiff's symptoms were compatible with Raynaud's (Tr. 277).

Plaintiff also treated with Dr. Lawrence Eilender, a neurologist, starting in 2016 (Tr. 290-303). Plaintiff's complaints to Dr. Eilender related to memory loss and chronic headaches. *Id.* Dr. Eilender prescribed her medications to aid with her complaints. *Id.*

While in Michigan, Plaintiff was also under the care of Dr. David Pawloski (Tr. 306-462). At her office visit on May 13, 2019, Plaintiff had no complaints, had good energy levels and was sleeping well (Tr. 456). Dr. Pawloski's records indicate that Plaintiff was diagnosed with hypertension, hypothyroidism, Raynaud's phenomenon, positive antinuclear antibody, BMI, chronic anemia, and menopause (Tr. 458). Dr. Pawloski treated Plaintiff with prescriptions. *Id*.

After moving to the Southern Illinois area in late 2019, Plaintiff began treating with Dr. Amar Sawar with the Neurology & Arthritis Clinic in Carbondale, Illinois (Tr. 559-582). Plaintiff advised Dr. Sawar that she had been diagnosed with mixed connective tissues disease, Raynaud's

phenomenon with discoloration of her fingers when exposed to cold weather, and Hashimoto

thyroiditis (Tr. 563).   She complained about puffy hands; excessive daytime sleepiness; loud

snoring; arthralgia in small joints of her hands, wrists, feet, and ankles; dry eyes, mouth and skin;

diffuse myalgia and stiffness with fatigue and leg cramps; neck pain that was dull, occasional, and

non-radiating; low back pain that was dull, constant, and radiated into her left leg; numbness and

tingling of both hands and feet; headaches with nausea twice a week on average; and, memory loss

for recent events.   *Id.*   Dr. Sawar ordered nerve conduction studies, x-rays, MRI, and continued

medication treatment (Tr. 566).

The nerve conduction studies showed electrodiagnostic evidence of mild left axonal

peroneal mononeuropathy with no evidence of lumbosacral radiculopathy or large fiber peripheral

neuropathy, and electrodiagnostic evidence of mild bilateral median neuropathy at the wrist (carpel

tunnel) with the right side worse but no evidence of ulnar neuropathy or cervical radiculopathy

(Tr. 578, 582).   X-rays were done of Plaintiff's feet, ankles, knees, hands, and wrists (Tr. 585-

594).   Generally, there were no acute abnormalities or evidence of inflammatory arthritis.   *Id.*

Plaintiff's knees and left hand showed only early osteoarthritic changes.   *Id.*   The MRI of

Plaintiff's lumbar spine showed mild disc desiccation with left lateral disc protrusion and mild left

foraminal stenosis (Tr. 495).

Dr. Sawar's continued treatment of Plaintiff in 2020 involved medication and the ordering

of a wrist splint to be worn at night (Tr. 559-562).   In 2021, Dr. Sawar saw Plaintiff again for the

same general complaints but more complaints with headaches and resulting nausea (Tr. 692-693,

710-715).   Dr. Sawar continued to treat Plaintiff with medication.   *Id.*

Plaintiff also began treating with a new primary care physician in Illinois, Dr. Michael

9

Ambrose (Tr. 499-544, 627-638).   Dr. Ambrose's examination of Plaintiff in January 2020 identified that Plaintiff had mixed connective tissue disorder since 2015; that Plaintiff reported pain and discoloration in her hands especially with temperature and weather changes; that Plaintiff had Raynaud's phenomenon, hypothyroidism, Hashimoto's syndrome, daily migraines, irritable bowel syndrome, and hormone related symptoms (Tr. 499-502).   Plaintiff complained of bilateral knee pain that was worsening with activity and bending.   *Id.*   She also complained of lower back pain with radiculopathy and weakness in her right leg.   *Id.*   Plaintiff indicated her back pain was worse with activity and with sitting, and she was unable to perform tasks at home.   *Id.*

Physical examination by Dr. Ambrose identified restriction and tenderness in C-spine palpation; restricted in movement of upper extremities like trapezius and shoulder muscles; hypertonic, tight restricted muscles in the lumbar area (especially L4-L5); hypertonicity and restrictions in movement in the thoracic area; and restriction in movement and tightness in the SI, pelvis, and lower extremities.   *Id.*   Dr. Ambrose treated Plaintiff with medication, orders for physical therapy, orders for a back brace, and various injections in her knees.   (Tr. 499-544, 627-638).   Throughout 2020 and her treatment with Dr. Ambrose, Plaintiff reported that both her knee and back pain seemed to be getting better even though she still had some right leg radiculopathy. *Id.*

In late 2020, Plaintiff went back to Dr. Ambrose and indicated that her knee pain was better but that her back pain was worse after spending time working in her yard (Tr. 627-629).   In early 2021, Plaintiff again went back to Dr. Ambrose and reported that her knee, lower back and neck pain were somewhat better and tolerable – the focus was then on her hormone treatments (Tr. 630-632).   In March 2021, Plaintiff again visited Dr. Ambrose to discuss her new migraine medication

and complained of heart palpitations (Tr. 633-635).   Dr. Ambrose referred Plaintiff to cardiology.

*Id.*

Plaintiff also treated with various specialists.   Dr. Shadab Bhutto, an internal medicine

specialist, tested and treated Plaintiff for hypothyroidism due to Hashimoto's, lupus, palpitations,

anemia, fatigue, fatty liver, shortness of breath, hypertension, thrush and migraines (Tr. 646-656).

Dr. Muhammad Jaffer Ansari, a cardiologist, treated Plaintiff in 2021 for her cardiac palpitations

and chest pain (Tr. 674-689).   Plaintiff had a cardiac cath procedure completed with a drug-eluting

stent.  *Id.*

### Opinions of Treating Physicians

On August 5, 2021, Dr. Amar Sawar completed a medical source statement on behalf of

Plaintiff (Tr. 703-709).   He indicates that Plaintiff was diagnosed with lupus, chronic migraines,

carpal tunel syndrome, nerve damage, and arthritis (Tr. 703).   He identifies Plaintiff's symptoms

to include migraines; pain and swelling in the legs, knees, feet and hands; vertigo; fatigue; memory

loss; back pain; and, hair loss.   *Id.*   Dr. Sawar indicates that plaintiff's pain increases with activity

or use.   *Id.*   He identified Plaintiff's reduced range of motion in her fingers and knees, reduced

grip strength, impair sleep, weight change, impaired appetite, tenderness, redness, swelling,

muscle spasms, and muscle atrophy.   *Id.*   Dr. Sawar indicated that anxiety affected Plaintiff's

pain (Tr. 704).   He opined that Plaintiff's pain is frequently severe enough to interfere with her

attention and concentration; and, that Plaintiff is severely limited in her ability to deal with work

stress.  *Id.*

Dr. Sawar also opined about Plaintiff's ability to perform regular and continuous activity

during an 8-hour workday (Tr. 705-708): Plaintiff could sit for 15 minutes maximum before

11

needing to walk about for 15 minutes (Tr. 705); Plaintiff would need to elevate both legs to at least

waist level while sitting to minimize pain; Plaintiff could only spend less than 1-hour cumulative

sitting during an 8-hour workday; Plaintiff could only stand or walk about for less than 15 minutes

before needing to lie down or recline in a supine position for at least 30 minutes (Tr. 705-706);

Plaintiff could only stand or walk about for less than 1-hour in an 8-hour workday (Tr. 706).   In

summary, Dr. Sawar opined that Plaintiff would spend a cumulative 5-hours resting or lying down,

1 hour sitting, and 1 hour standing or walking about (Tr. 707).

Additionally, Dr. Sawar opined: Plaintiff could rarely or not at all lift or carry any weight

from 1-50 pounds, balance when standing or walking on level terrain, stoop or bend over, look

down at a table or desk, look upward at the ceiling or sky, look sideways to the right or left (Tr.

707); Plaintiff could rarely (if at all) reach, handle, or finger anything with her right or left hand,

except that he believed Plaintiff could occasionally reach with her left hand (Tr. 708); Plaintiff

was not in need of an assistive device for ambulating; and Plaintiff would have both "good days"

and "bad days", but he believed she would be absent from work more than 3 times per month (Tr.

709).

**Consultative Examinations**

Dr. Adrian Feinerman conducted an internal medicine examination of Plaintiff on October

2, 2020 (Tr. 601-609).   He noted that Plaintiff was able to ambulate 50 feet without an assistive

device and was able to get on/off the exam table, stand on toes, stand on heels, and squat and rise

(Tr. 606).   Plaintiff's muscle strength was normal; her fine and gross manipulation was normal

(including fingers and thumbs); she was able to dress and undress herself.   Her deep tendon

reflexes were normal and equal bilaterally.   She was oriented to person, place and time, and her

12

appearance, behavior, memory and concentration were normal.  *Id.*   His diagnostic impressions

were systemic lupus erythematosus (diagnosed in January 2020); hypothyroidism, degenerative

joint disease, and hypertension; mixed connective tissue disease, Raynaud's phenomenon, irritable

bowel syndrome, bilateral carpal tunnel syndrome (since January 2020); knee pain, low back pain,

and vertigo (Tr. 606-607).   He concluded that Plaintiff is able to sit, stand, walk, hear, and speak

normally and is able to lift, carry, and handle objects without difficulty (Tr. 607).

Plaintiff underwent a psychological consultative examination with Dr. Linda L.

Collinsworth, Ph.D. on September 8, 2020 (Tr. 597-600).   The examination was conducted by

video.   Id.   Dr. Collinsworth found no errors in Plaintiff's answers to questions and the exams

and did not assign a DSM 5 diagnosis.   *Id.*   She found that Plaintiff was capable of managing her

own funds.   *Id.*

### State Agency Consultants' Opinions

Dr. James Hinchen MD reviewed the evidence and opined that Plaintiff has exertional

limitations:   Plaintiff could only occasionally lift and/or carry 20 pounds, could frequently lift

and/or carry 10 pounds, could only stand and/or walk for a total of 6 hours in an 8-hour workday,

and could only sit for a total of 6 hours in an 8-hour workday (Tr. 70-71).   Plaintiff was limited

to work consistent with light exertional level with occasional climbing of ladders/ropes/scaffolds

and occasional stooping, kneeling, crouching, and crawling (Tr. 71).   Plaintiff should avoid

concentrated exposure to extreme cold, extreme heat, and hazards like machinery and heights (Tr.

72).

Dr. Bharati Jhaeri MD also reviewed the evidence and opined that Plaintiff had exertional

limitations:   Plaintiff could occasionally lift and/or carry 20 pounds, could frequently lift and/or

carry 10 pounds, could only stand and/or walk about 6 hours in an 8-hour workday, and could only

sit about 6 hours in an 8-hour workday (Tr. 90); Plaintiff was limited to work consistent with light

exertional level with occasional climbing of ladders/ropes/scaffolds and occasional stooping,

kneeling, crouching and crawling (Tr. 91); Plaintiff should avoid concentrated exposure to extreme

cold, extreme heat, and hazards like machinery and heights (Tr. 92).

## **Discussion**

Plaintiff asserts that the ALJ erred by failing to comply with applicable regulations in

evaluating Plaintiff's subjective complaints and by failing to seek development of the record

despite the RFC's significant departure from the available opinion evidence.   The Court disagrees.

The RFC is a measure of what an individual can do despite the limitations imposed by her

impairments.   20 C.F.R. §404.1545(a).   It is a "function-by-function assessment based upon all

of the relevant evidence of an individual's ability to do work-related activities," Id., and must be

supported by substantial evidence.   *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).   "As a

general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must

incorporate all of the claimant's limitations supported by the medical record."   *Yurt v. Colvin*, 758

F.3d 850, 857 (7th Cir. 2014).

The ALJ bears "the 'final responsibility' for determining a claimant's residual functional

capacity."   *Fanta v. Saul*, 848 Fed. Appx. 655, 658 (7th Cir. 2021) *quoting* 20 C.F.R.

§404.1527(d)(2).   The Court's "role is to determine whether the ALJ applied the right standards

and produced a decision supported by the substantial evidence."   *Jeske v. Paul*, 955 F.3d 583,

595-596 (7th Cir. 2020).   An "ALJ has the obligation to consider all relevant medical evidence

and cannot simply cherry-pick facts that support a finding of non-disability while ignoring

14

evidence that points to a disability findings." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). However, "an ALJ need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion." *Id. citing Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).

In this case, the ALJ supported her RFC determination with substantial evidence and accurately characterized both Plaintiff's subjective complaints and the medical evidence. The ALJ did not dispute that Plaintiff had impairments that caused her difficulties, but questioned Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms. She engaged in a detailed discussion of the medical records and Plaintiff's testimony and was entitled to rely on the totality of the objective medical evidence and Plaintiff's subjective statements in the record.

Plaintiff argues that the ALJ should have found that she needed to elevate her legs due to swelling in her lower extremities. The record demonstrates that the ALJ considered Plaintiff's complaints of swelling in light of the objective medical evidence that showed no swelling in Plaintiff's lower extremities. The ALJ found the medical evidence more persuasive. There is no indication in the objective medical evidence and records that Plaintiff reported to any of her treating physicians with swelling in her lower extremities. Nor did she not seek any treatment by her physicians for swelling in the lower extremities.

The only indication that Plaintiff needed to elevate her lower extremities because of swelling was in Dr. Sawar's medical opinion. However, his opinion is not consistent with his own medical records and examinations of Plaintiff. Supportability and consistency are "the most important" factors, and the only factors that must be explained by the ALJ, in weighing the medical opinions that are provided by a plaintiff. *See* 20 C.F.R. §404.1520c(a) and (b)(2). The ALJ fairly

15

and accurately relied on the totality of the objective medical evidence and ultimately found the state agency consultants' opinions more consistent and persuasive.  Further, the ALJ's reduced sedentary RFC accurately accounted for the physical impairments that Plaintiff' complaints of – even any potential swelling of lower extremities.

Plaintiff also argues that the ALJ should have found that she was unable to work in temperatures below 60 degrees because of the medical symptoms and complications she had with her extremities (specifically hands and fingers).  The ALJ did in fact include in her RFC that Plaintiff was to be precluded from concentrated exposure to extreme cold.  That assessment is consistent with the state agency consulting physicians' evaluations and is more detailed than the opinions provided by Plaintiff's treating physicians.  None of Plaintiff's treating physicians identified a specific temperature or threshold at which Plaintiff's symptoms increased or became worse.  Plaintiff has failed to identify with any specific medical evidence that shows at what temperature those conditions and symptoms begin.   Thus, the ALJ's RFC that precluded Plaintiff from concentrated exposure to extreme cold accurately and adequately considers the need to minimize her symptoms associated with temperature and weather changes.

Plaintiff also disagrees with the ALJ's findings with respect to fine and gross manipulative restrictions of her hands and fingers.  The ALJ's RFC identifies the issue of fine and gross manipulation of the hands and fingers, but the RFC indicates that the limitation is minimal.   There is no objective medical evidence in the record that Plaintiff's fine and gross manipulation is so limited or hindered so as to require a greater limitation than that imposed by the ALJ.   Rather, the objective medical evidence indicates that Plaintiff has no (or very limited) fine and gross manipulation limitations other than her own complaints.  Examinations and imaging results by

16

treating and consulting physicians confirmed that Plaintiff was capable of significant fine and gross manipulation of her hands and fingers. Plaintiff never sought separate or specific treatment or therapy as it related to any fine and gross manipulative symptoms. The ALJ went beyond the scope of what any treating or consulting physician recommended because she recognized the potential impact of Plaintiff's underlying diagnosed conditions, like carpal tunnel syndrome.

In sum, the ALJ identified and referenced the evidence and weight she ascribed to various portions of the evidence in supporting her opinion and decision – logically building a bridge to her ultimate conclusions. She took great detail in evaluating and weighing every treating physician, consulting physician, and Plaintiff's own testimony. While Plaintiff may disagree with the ALJ's ultimate conclusions, the Court does not find that the ALJ committed reversible error in any respect.

### Conclusion

After careful review of the record, the Court concludes that the ALJ committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED:   March 29, 2025**

**STACI M. YANDLE**
**United States District Judge**

17